[Crim. No. 160. Fifth Dist. Aug. 17, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
HAROLD LEE MOLES, Defendant and Appellant.

612

## COUNSEL

Robert Y. Bell for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Roger E. Venturi and Gary Allon Larson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STONE, P. J.**—This appeal, which was reinstated pursuant to *Anders* v. *California*, 386 U.S. 738 [18 L.Ed.2d 493, 87 S.Ct. 1396], is from a judgment entered pursuant to a jury verdict of guilty of assault with a deadly weapon with intent to commit murder, violation of Penal Code section 217. Appellant was also convicted of conspiracy to commit an assault, violation of Penal Code section 182, subdivision 1, which was dismissed before sentence was imposed on the conviction under section 217.

The case arises from a brawl that took place in the Buckhorn Tavern on the outskirts of the City of Visalia, on the night of June 29, 1964. Some months earlier appellant and his nephew, Ronald Merchant, created a disturbance in the Buckhorn Tavern and, upon complaint of the proprietor, Ocie Jones, both were convicted of disturbing the peace. On several occasions thereafter they threatened to get even with Jones.

On the night in question, appellant and his nephew, accompanied by his brother, Robert Moles, and his brother-in-law, Roy Harp, drove to the Buckhorn Tavern between 10:30 and 11 p.m. Appellant and Merchant remained outside while Robert Moles and Harp entered the building. After going to the restroom, they walked to a pool table near the door and started banging the balls against the table top. Merchant left the automobile and walked to the open door of the tavern next to the pool table, and shouted at Jones: "You big, fat son-of-a-bitch, I have come in here to beat you within an inch of your life." Jones moved toward the door and asked, "What for, Butch?" Merchant replied, "For making me pay a $58.00 fine." Jones said: "Why don't you come on in, Butch, enjoy yourself and forget it?"

As Jones passed near the pool table, Harp and Robert Moles grabbed him from behind and threw him on the pool table; Merchant rushed from the doorway to the pool table, and all three men beat Jones with their fists. He struggled to his feet, removed a pocket knife from his pocket but it was knocked from his hand before he could open it. As he made his way to the back of the bar, the three men continued to strike him with their fists; one of them struck him with a bar stool. He reached into a drawer behind the bar and picked up a .22 caliber revolver which belonged to his bartender. His assailants struggled with him for possession of the gun and when it appeared they would take it from him, he aimed in the direction of a water heater and fired two shots. He pulled the trigger a third time and the gun "snapped" but did not fire, from which Jones concluded the gun was empty.

The shooting caused a cessation in the fighting and Jones for the first time noticed appellant, who had entered the tavern when he heard the shots fired. For some unexplained reason, Jones handed the gun to appellant and said: "I don't know what you came in for but evidently you did what you wanted to, you beat the hell out of me. Now, take the gun and get out." Merchant said: "And leave you walking around in here, you son-of-a-bitch? When we walk out of here you are going to be on the floor." Thereupon Robert Moles, Harp and Merchant resumed beating Jones. Appellant remained at

the end of the bar and shot at Jones with the .22 revolver, which was not empty as Jones had believed. Jones fought his way over to the other end of the bar, where he got his .38 revolver out of a drawer and fired four times in the direction of the four men before he momentarily lost consciousness. Upon regaining his senses, he saw none of his attackers, but immediately appellant and Robert Moles returned. Appellant again fired at Jones, missed, threw his gun at him, and ran. Robert Moles threw two bar stools at Jones and ran out the front door as Jones went out the back door. Jones told an attendant at a nearby gasoline station that he had been shot and asked him to call the sheriff and an ambulance.

Ronald Merchant, who was shot, apparently by Jones, died from his wounds. Appellant was wounded twice, but recovered. Jones was struck by five bullets and sustained serious injuries, but recovered.

Appellant's principal ground of appeal is that the court erred in failing to instruct the jury, *sua sponte*, on the lesser included offense of assault with intent to commit voluntary manslaughter. He argues that in a murder case, killing in the heat of passion or with diminished capacity can be shown to reduce the killing from murder to voluntary manslaughter, and that it logically follows that the same facts, if proved, may rebut malice when the charge is assault with intent to commit murder.

Respondent asserts that appellant's argument is untenable because assault with intent to commit voluntary manslaughter is not a lesser included offense in a crime of intent to commit murder, relying upon *People* v. *Mason,* 183 Cal.App.2d 168, 175 [6 Cal.Rptr. 649], which in turn relies upon *People* v. *Bernard,* 28 Cal.2d 207, 214 [169 P.2d 636]. These cases hold that as far as the charge of assault with a deadly weapon with intent to commit murder is concerned, "the law (Pen. Code, § 217) recognizes no such offense as assault with intent to commit murder of the second, as opposed to the first, degree." (P. 214.)

Respondent misses the mark, for voluntary manslaughter is not a degree of murder; it is a separate crime. A killing committed in the heat of passion, as delineated in Penal Code section 192, subdivision 1, or by a defendant who lacks malice because of diminished capacity due to mental defect, mental illness or intoxication (*People* v. *Conley,* 64 Cal.2d 310, 324-325 [49 Cal.Rptr. 815, 411 P.2d 911]), is voluntary manslaughter, and not murder.

Penal Code sections 187, 188 and 189 define murder, and make it clear that an intent to *kill* is not sufficient to sustain a conviction of murder; malice must be proved before the killing is murder. Logically, an assault with intent to commit *murder,* as contrasted with an intent to *kill,* would seem to require proof of the same element, the mental state of malice.

Otherwise we face a paradoxical result. For example, were a defendant to shoot two men during a single incident, one of whom died, the basic criminal elements of the act, the shooting and the mental state, would be the same as to each simultaneous shooting; the fact of death would be but a manifestation of the seriousness of the result, not of the actor's mental state when the act was committed. It is settled law that as to the resulting murder charge the defendant could assert both heat of passion and diminished capacity in an effort to reduce the crime to voluntary manslaughter; consequently we are impelled to conclude that as to the victim who lived, the defendant could assert the same grounds in an effort to reduce the crime from assault with intent to commit murder (Pen. Code, § 217) to assault with intent to commit voluntary manslaughter (Pen. Code, § 221).

■ Two of the proffered instructions on assault with intent to commit murder used the word "kill" interchangeably with the word "murder." In one instance the trial court struck the word "kill" and inserted "murder." However, the court gave former CALJIC 609 just as it was then printed, to wit: "To constitute the crime of assault with intent to commit murder there must exist an assault and, in the mind of the perpetrator, a specific preconceived intent to *kill* a human being." (Italics added.) Some time after the trial of this case, the editors of CALJIC discovered the error and replaced CALJIC 609 by 9.01, which omits the word "kill," and correctly specifies "murder."

It does not appear from the record that giving this erroneous instruction confused the jury or misled them, rather, the question emerges whether failure to instruct on voluntary manslaughter as a lesser included offense to the charge of assault with intent to commit murder constituted reversible error. Appellant did not submit an instruction on voluntary manslaughter; his defense primarily was self-defense and the absence of a specific intent to commit murder. But the fact he offered no instruction upon the subject does not relieve the trial judge of the responsibility of instructing on voluntary manslaughter as a lesser included offense, provided "there was sufficient evidence in the case upon which the jury might have returned a verdict of manslaughter." (*People* v. *Manzo,* 9 Cal.2d 594, 598 [72 Cal.Rptr. 119].)

■ There are, as we have noted, two kinds of voluntary manslaughter, statutory, where the killing occurs "upon a sudden quarrel or heat of passion," and non-statutory, where by reason of diminished capacity a defendant is incapable of forming the mental state of malice. Consequently we examine the record as to both kinds of voluntary manslaughter in determining whether the evidence required a *sua sponte* instruction on assault with

intent to commit voluntary manslaughter as a lesser included offense. ▮ The record does not support appellant's contention that there was a sudden quarrel, or that he assaulted Jones in the heat of passion. The jury convicted all three defendants of conspiracy to commit assault with intent to commit murder. The evidence reflects, and the jury found, that the four participants went to the Buckhorn Tavern with the preconceived idea of wreaking vengeance on the proprietor. Appellant's brother and brother-in-law, who had had no trouble with Jones and who therefore would not incite suspicion, went in first and placed themselves at the pool table by the door, an advantageous position from which to attack Jones as he passed by, while appellant and Merchant, who had been involved in a previous fracas with Jones, remained outside. The two men who were inside created a ruckus, got Jones over by the pool table and, as he moved toward the cursing Merchant who had entered the doorway, they commenced an attack upon him. Merchant then entered the tavern and joined in the attack. After the shooting commenced, appellant also rushed in to join the attackers. A break occurred in the fighting and during the lull Jones gave appellant and his three companions ample opportunity to leave; instead, they renewed their attack upon Jones.

▮▮ In the circumstances, there was no error in failing to give a *sua sponte* instruction involving the elements of sudden quarrel and heat of passion in the crime of statutory voluntary manslaughter. This is so particularly since appellant offered no such defense and requested no such instruction.

As to non-statutory voluntary manslaughter, no instruction was offered by the defense, and the cases establish that the court need not give such an instruction *sua sponte,* in the absence of evidence of diminished capacity which would negate the existence of malice. ▮ The record reflects only that appellant and his companions had been drinking; there is nothing to indicate that their state of intoxication even approached the degree of diminished mental capacity that would render a person incapable of forming malice. For example, Roy Harp, a codefendant and brother-in-law of appellant, testified: "Q. Were you intoxicated at that time? A. No, I wasn't intoxicated, but I wasn't what you call real sober, either. I had been drinking. Downtown I drank about four beers, something like that. Q. Were the other men intoxicated? A. Well, they were just like myself, we had been drinking."

The testimony as to drinking was general; all of them had had a few beers or a couple of screwdrivers, but none was intoxicated. The substance of the testimony is that all of the men knew what they were doing, they could "navigate," and no one testified specifically as to appellant's condition or

how much he had been drinking. Moreover, each of the three defendants, including appellant, clearly recalled the events of the evening and related them in considerable detail. No one contended that his recollection of the events was hazy or that he was in an amnestic state at the time the relevant events occurred. The doctor who treated appellant in the hospital shortly after conclusion of the fight, was not questioned about appellant's condition as to sobriety or inebriety. In short, there is nothing in the record which could have alerted the trial judge to the fact that appellant was relying upon diminished capacity or that he was suffering from diminished capacity at the time of the shooting. ■■ The record does not justify a *Conley*-type instruction, *sua sponte*. In *People* v. *Harris,* 7 Cal.App.3d 922, 926 [87 Cal.Rptr. 46], we cite cases holding that there is no duty to give such an instruction where the evidence of intoxication is fragmentary, minimal, sketchy, speculative, or only distantly, if at all, suggested by the evidence.

■■ Finally, appellant contends that inadequate representation by trial counsel entitles him to a reversal. His specific charge is that trial counsel failed to submit or request instructions on assault with intent to commit voluntary manslaughter as a lesser included offense, together with instructions on the elements of voluntary manslaughter, both statutory and nonstatutory. In view of our conclusion that the evidence does not warrant such instructions, we conclude that the argument is untenable.

The judgment is affirmed.

Gargano, J., and Ginsburg, J.,* concurred.

*Assigned by the Chairman of the Judicial Council.