[Crim. No. 6662. Third Dist. May 1, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE RAY HEFFINGTON, Defendant and Appellant.

2

## COUNSEL

Carl B. Shapiro and Shapiro, Shapiro & Shapiro for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Marjory Winston Parker and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

FRIEDMAN, J.—An information charged defendant with assault with intent to commit murder. (Pen. Code, § 217.) He pleaded not guilty and not guilty by reason of insanity. A jury found him guilty as charged and another jury found him to have been sane. He appeals.

Early in the evening of August 29, 1971, Robert Mattos was standing between two parked cars on a street in Weaverville. Mattos, who was 17 years old, had shoulder-length hair, sideburns, whiskers, and a moustache. Defendant, who was a passenger in a cattle truck driven by his wife, stuck his head out of the window and yelled derisive words directed at Mattos' long hair. In response, Mattos "flipped the man the bird," i.e., lifted his finger skyward. The truck continued onward to defendant's home, where its cargo of animals was unloaded.

Defendant's wife then drove him back to Weaverville, where defendant made inquiries as to the whereabouts of the youth who had made the finger sign. The truck finally pulled up to a curb and stopped. Defendant got out of the truck, crossed the street and walked up to Mattos. As defendant crossed the street, he fumbled with a knife contained in a sheath. Defendant asked Mattos if he was "the guy that flipped him off," and Mattos replied in the affirmative. Defendant immediately took a swing at Mattos, but Mattos blocked the swing and hit back at defendant, striking him in the face or chest area.

A fight ensued during which Mattos kicked defendant either just above the belt or in the groin. Defendant then drew his knife, advanced on Mattos and began to swing at him. Mattos stepped back and removed his belt in order to ward off the knife. Defendant swung the knife five times; on the third swing he cut Mattos on the left shoulder, ultimately leaving a scar. All during the fight, Mattos was trying to get away.

Undersheriff Laag of Trinity County came upon the scene and observed defendants striking at Mattos with a knife while the latter was trying to back off. When the two participants failed to heed Laag's demands to stop the fight, Laag drew his service revolver and defendant then desisted and placed the knife in his rear pocket. Laag grasped defendant by the wrists and told him he was under arrest. Defendant broke away and went across the street toward his truck. Laag caught up with defendant and struggled with him until two other deputies arrived. Defendant was then placed under arrest and escorted to jail. Laag noticed the odor of alcohol on defendant's breath but detected no signs of intoxication.

After waivers by defendant and his wife, the wife took the stand as a prosecution witness. She testified that defendant had consumed five beers over a period of several hours preceding the fight. That afternoon, while transporting livestock back from a ranch, defendant had complained of a headache and double vision and asked his wife to drive the truck. She testified that she had observed or heard nothing as they drove through Weaverville on their way to their home; that after unloading the animals, defendant was told by his son that a hippie had given him the finger as they drove through town; that defendant wanted to find out why and had his wife drive him back to town. After she drove around for a while, defendant told her to stop, noting that he saw a youth who might know. Defendant's wife witnessed the ensuing fight but claimed that Mattos was the aggressor.

Defendant testified in his own behalf. Earlier in the day, he had consumed five beers. He and his wife had been moving horses from a ranch to their home. He testified that he did not recall leaving or driving from the ranch, arriving in Weaverville or unloading the stock. He did recall that someone, perhaps his wife, told him that somebody in town gave him the finger. He returned to Weaverville looking for this person. When asked why he went looking for this particular individual, defendant replied, "Well, if you gave me the finger, I'd ask you why."

Defendant testified that the ensuing events were somewhat hazy. He did remember approaching Mattos and asking him, "Did you give me the

finger?" Mattos, according to defendant, answered, "Yeah, man," and came running at him like a "wild bull," and kicked him in the testicles. Defendant recalled pulling his knife to use it in his own defense; he recalled intending to use it in his own defense and recalled that he was afraid for his life. The next thing defendant recalled was Officer Laag trying to restrain him but he had no idea why. He recalled dropping the knife at Laag's request. Defendant did not remember much of what occurred thereafter until he was booked.

Defendant testified that he had suffered a series of head injuries through fights and being stomped by a saddle horse. He had sought medical advice but no cure had been found. Defendant also stated that he is unable to drink intoxicating beverages to the same degree as he could prior to the head injuries. The testimony of relatives and friends tended to corroborate defendant's history of head injuries, problems of recollection, eye difficulties and his decreased tolerance to alcohol.

Two psychiatrists, Dr. O'Neill and Dr. Abrahams, had examined defendant under court appointment. Dr. O'Neill was called as a defense witness and Dr. Abrahams as a prosecution rebuttal witness.

The court instructed the jury that assault with intent to commit murder required proof of a specific intent to murder; that malice, express or implied, was an element of murder; that the jury should consider if defendant was intoxicated in determining if he had specific intent; that the jury should determine whether defendant was suffering from some abnormal mental or physical condition which prevented him from forming the requisite specific intent; that (simple) assault was a necessarily included crime in the offense charged. The court rejected a request for an instruction on unconsciousness as a defense. (CALJIC No. 4.30.)

I

Defendant assigns error in the trial court's refusal to instruct on unconsciousness. We consider this claim in the light of two principles: first, that unconsciousness is a complete defense except where it is caused by voluntary intoxication (Pen. Code, § 26, subd. 5; *People* v. *Wilson,* 66 Cal.2d 749, 761 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Conley,* 64 Cal.2d 310, 323 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Graham,* 71 Cal.2d 303, 316-317 [78 Cal.Rptr. 217, 455 P.2d 153]); second, that defendant was entitled to a jury instruction on any theory, no matter how remote or incredible, which had the support of " 'any evidence deserving of any consideration whatsoever' " (*People* v. *Sam,* 71 Cal.2d 194, 211 [77 Cal.Rptr. 804, 454 P.2d 700]).

Dr. O'Neill testified that he had not arrived at any diagnosis of defendant's mental condition on the day of the events. He said that he did not feel defendant was suffering from any psychiatric disease at the time. He had reviewed defendant's medical history, which confirmed the past occurrence of head injuries. He stated that repeated head injuries may increase a person's sensitivity to alcohol so that a relatively small number of drinks would result in a condition of "paradoxical intoxication." A person in that condition might undergo a personality alteration and have an amnesia concerning the occurrences during that period. Dr. O'Neill had no opinion as to whether defendant was suffering from paradoxical intoxication at the time of the events. On the assumption that defendant had consumed four to six beers before the fight and on the assumption that he might have been suffering from paradoxical intoxication, Dr. O'Neill concluded that defendant's capacity to form an intent was unimpaired on the day in question, but that at some time during the altercation with Mattos he "may or may not have lost his capacity to continue to form a rational intent."

Dr. Abrahams found that defendant could remember some of the events but not others. He believed defendant was the kind of person who would tend to forget distasteful or unpleasant things. He testified that a person like defendant would have an impaired ability to premeditate, that is, to carry out a preconceived objective. Dr. Abrahams believed that defendant (placed in the situation of the altercation) could not form a specific intent to kill, as intent is explained in psychological terms. He testified that in a primitive sense defendant might have intended to do bodily harm to the victim, but was not sure whether he was able to differentiate between killing and bodily injury, since the concept of "killing" is a fairly complicated concept. He testified that pathological intoxication[1] was a very rare diagnosis, which he rejected in defendant's case because the physical findings did not support it.

In the sense intended by Penal Code section 26, subdivision Five, unconsciousness includes not only a state of coma or immobility, but also a condition in which the subject acts without awareness. (*People* v. *Newton,* 8 Cal.App.3d 359, 376 [87 Cal.Rptr. 394].) Neither Dr. O'Neill nor Dr. Abrahams testified to a lack of consciousness or state of automatism; neither expressed an opinion that defendant lacked awareness of his actions before and during the fight. Dr. O'Neill found no psychopathological condition, described "paradoxical" intoxication as no more than a possibility and, even as to that condition, suggested no loss of awareness, not even a momentary loss. Dr. Abrahams testified to impaired ability to

---

[1]Dr. Abrahams stated that this was probably the term meant by Dr. O'Neill when he referred to "paradoxical intoxication."

deliberate but not to loss of awareness. He described defendant's tendency to block out the memory of unpleasant events, but did not describe this lack of memory as amnesia traceable to loss of awareness.

In his own testimony defendant displayed ability to remember some parts of the incident and not others. He remembered returning to town to search for the man who had given him "the finger"; did not recall striking the man but did recall the man rushing at him and kicking him in the testicles; recalled reaching for his knife and pulling it out but not that he himself had swung the knife; recalled dropping the knife at the officer's request but not much of the events thereafter until he was booked at the jail. As a reviewing court we assume that his selective recollection was natural, not feigned. Nonetheless, it fell far short of a claim or description of unawareness coexistent with the fight. In short, there was no claim or description of coexistent unconsciousness, either from the psychiatrists or defendant.

Defendant relies upon *People* v. *Wilson, supra,* 66 Cal.2d 749, and *People* v. *Bridgehouse,* 47 Cal.2d 406 [303 P.2d 1018], as authority for the proposition that a defendant's inability to remember or his "hazy" recollection supplies an evidentiary foundation for a jury instruction on unconsciousness. Neither *Wilson* nor *Bridgehouse* announces an ineluctable rule of law so divorced from reality. Both were individualized decisions in which the court examined the record and found evidence, no matter how incredible, warranting the instruction. Here, in contrast, we find no evidence "deserving of consideration" that defendant was unaware of his actions. The trial court correctly rejected the unconsciousness instruction.

## II

We sustain defendant's next contention—that the trial court erred by failing to instruct *sua sponte* on attempted voluntary manslaughter as a lesser included offense. In the rush and flurry of trial a judge might easily overlook the possibility that assault with intent to commit murder may include the lesser crime of attempted voluntary manslaughter, particularly when the defendant's trial counsel does not request an instruction on the latter. However hooded the possibility in terms of crime nomenclature, a trial judge must instruct *sua sponte* on any lesser included offenses "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People* v. *Wilson, supra,* 66 Cal.2d at p. 759.)

Penal Code section 664 fixes the penalties for crime attempts not punishable under other statutes. An attempt to commit a crime may occur when the defendant's criminal goal is frustrated by extraneous circumstances.

(*People* v. *Staples,* 6 Cal.App.3d 61, 67 [85 Cal.Rptr. 589].) ■ Assault with intent to commit murder is one form of attempted murder, but it is punishable under Penal Code section 217 rather than section 664. ■ The crime of assault with intent to commit murder requires proof of a specific intent to murder, but without regard to any distinction between first and second degree murder. (See *People* v. *Bernard,* 28 Cal.2d 207, 214 [169 P.2d 636]; *People* v. *Moles,* 10 Cal.App.3d 611, 615-616 [89 Cal.Rptr. 226]; *People* v. *Meriweather,* 263 Cal.App.2d 559, 563 [69 Cal.Rptr. 880]; *People* v. *Mason,* 183 Cal.App.2d 168, 175 [6 Cal.Rptr. 649].) ■ Both first and second degree murder require existence of the state of mind known as malice; aside from felony murder, a specific intent to kill is a necessary ingredient of first degree murder but not of second degree murder. (*People* v. *Conley,* 64 Cal.2d 310, 320 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Gorshen,* 51 Cal.2d 716, 730-732 [336 P.2d 492].) Hence, it is incorrect to say that assault with intent to commit murder requires proof of specific intent to kill; more accurately, one should speak of specific intent to commit murder. (*People* v. *Moles, supra,* 10 Cal.App.3d at pp. 615-616; cf. *People* v. *Sartain,* 268 Cal.App.2d 486 [73 Cal.Rptr. 799], and cases cited.)

■ An indictment for murder charges all offenses necessarily included in the crime of murder, including voluntary and involuntary manslaughter. (*In re McCartney,* 64 Cal.2d 830, 831 [51 Cal.Rptr. 894, 415 P.2d 782].) A jury may find the defendant guilty of any offenses necessarily included in the crime with which he is charged, or of an attempt to commit the offense. (Pen. Code, § 1159.) ■ When the charge is intentional murder (as distinguished from felony murder), evidence that the defendant committed the homicide in a sudden quarrel or heat of passion or, alternatively, evidence that by reason of mental disease, mental defect or intoxication he lacked capacity to harbor malice, may form the basis for a voluntary manslaughter verdict. (See, e.g., *People* v. *Mosher,* 1 Cal.3d 379, 385 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Graham,* 71 Cal.2d 303, 310, 315-316 [78 Cal.Rptr. 217, 455 P.2d 153]; cf. *People* v. *Conrad,* 31 Cal.App.3d 308, 326-332 [107 Cal.Rptr. 421].) Under appropriate circumstances the jury may find involuntary manslaughter as a lesser included offense. (See *People* v. *Modesto,* 59 Cal.2d 722, 727-730 [31 Cal. Rptr. 225, 382 P.2d 33].)

■ Just as evidence of a killing without malice requires a manslaughter instruction in a murder trial, so evidence of an attempted killing without malice requires an attempted manslaughter instruction in a trial for violating Penal Code section 217. At least two decisions involving

convictions under section 217 have—more or less implicitly—recognized a necessity for *sua sponte* instructions on attempted voluntary manslaughter, but found no necessity in the particular case because there was nothing in the record which could have alerted the trial judge to the defendant's reliance on evidence negativing malice. (*People* v. *Moles, supra,* 10 Cal.App.3d at pp. 617-618; *People* v. *Koontz,* 7 Cal.App.3d 30, 37 [86 Cal.Rptr. 374].)

Here, in contrast, both prosecution and defense produced evidence reasonably justifying the inference that defendant had been frustrated in an attempt to kill Mattos "in a sudden quarrel or heat of passion" and without malice aforethought. The defense, moreover, had produced evidence that he suffered from a chronic impairment of the deliberative faculties aggravated, at the time of the incident, by ingestion of alcohol. Thus there was evidence of an attempt to commit both kinds of voluntary manslaughter: the "sudden quarrel or heat of passion" variety and the "diminished capacity" variety. The trial court had notice of defendant's reliance on this evidence. Indeed, his attorney argued diminished capacity to the jury, and the court recognized that concept in an instruction which—far from permitting the jury an intermediate verdict—gave the jury a limited choice between conviction and acquittal. The court had a *sua sponte* obligation to give instructions on attempted voluntary manslaughter because that crime was "closely and openly" suggested by the evidence. (*People* v. *Wilson, supra,* 66 Cal.2d at p. 759.) Such an attempt was a lesser included offense punishable under Penal Code section 664 rather than section 217.

### III

Defendant assigns error in the italicized portion of the following jury instruction, essentially a rendition of CALJIC Nos. 8.10 and 8.11: "Murder is the unlawful killing of a human being with malice aforethought. Malice may be either expressed [*sic*] or implied. Malice is expressed [*sic*] where there is manifested an intention unlawfully to kill a human being. Malice is implied when a killing results from an act involving a high degree of probability that [it] will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life *or when a killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life.*" (Italics supplied.)

By parity of reasoning with *People* v. *Ireland,* 70 Cal.2d 522, 538-539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], the italicized por-

tion of CALJIC No. 8.11 should not be given in a trial for assault with intent to commit murder. *Ireland* holds that in a murder trial a second degree felony-murder instruction should not be given when it is based on a felony which is an integral part of the murder. Specifically, *Ireland* teaches that the court should not tell the jury that malice may be implied from a killing perpetrated in the course of a felonious assault; that such an instruction tends to relieve the jury of the necessity of finding actual malice.

We have already observed that assault with intent to commit murder is one form of attempted murder; that specific intent to commit murder, without regard to the murder's degree, is an essential element of the crime. As a matter of abstract law, second degree murder may result as the byproduct of a dangerous felony, for example, felonious assault, even though the accused does not harbor an actual intent to kill. (*People* v. *Ireland, supra,* 70 Cal.2d at p. 538.) When this abstract proposition is injected into a trial for assault with intent to commit murder, it dilutes the demand for proof of specific intent to commit murder. It permits the jury to substitute a finding of relatively undifferentiated assaultive intent for the specific intent to murder which is a vital element of the crime. The trial court erred by giving the italicized portion of CALJIC No. 8.11.

## IV

The trial judge gave several instructions on simple assault as a lesser included offense, among them an instruction on general criminal intent (CALJIC No. 3.30).[2] We reject defendant's contention that this instruction diverted the jury from the necessity of finding specific intent to murder as an element of the charged offense. The instructions on the charged offense unequivocally demanded a jury finding of specific intent to commit murder. The general intent instruction was so worded and so segregated as to apply only to the offense of simple assault. There is no reasonable possibility of jury confusion at this point.

Similarly, an instruction that intoxication was no defense to the crime of assault (CALJIC No. 4.20) was sufficiently segregated as to apply only to the jury's consideration of simple assault. It did not blunt or negative the instructions on intoxication as a factor in the crime of assault with intent to commit murder.

---

[2]Despite defendant's use of a deadly weapon, the instruction on simple assault was appropriate in view of evidence that he first struck Mattos with his hands or fists and drew the knife later in the course of the fight. (Cf. *People* v. *Walker,* 82 Cal.App.2d 196, 199 [185 P.2d 842].)

Although defendant charges otherwise, there was an adequate evidentiary foundation for an instruction on attempted flight. (CALJIC No. 2.52; see *People* v. *Kessler,* 257 Cal.App.2d 812, 814-815 [65 Cal. Rptr. 248].)

Defendant charges error because an instruction on the use of a knife in self-defense against an assault with the fists (CALJIC No. 5.30) did not take account of defendant's version of the fight, which included a claim that Mattos had kicked him in the testicles. The instruction was adequate; reasonable jurors would consider the instruction in relation to any weaponless assault, whether with the fists or feet.

The court supplied the jury with three verdict forms, one finding guilt of assault with intent to commit murder, a second finding guilt of assault, and a third finding defendant "NOT GUILTY of the offense charged." Defendant complains that these forms tended to foreclose the jury from outright acquittal. Although, strictly speaking, the acquittal form was confined to "the offense charged," it was available for the jury's use had they chosen outright acquittal. The jury chose to find defendant guilty of the offense charged; the absence of a form calling for outright acquittal was inconsequential.

At defendant's insanity trial the jury was instructed in conformity with the *M'Naughton* definition of legal insanity prevailing in the California courts. Defendant asks this court to abandon the *M'Naughton* criterion in favor of some other formula, such as the *Durham* rule (*Durham* v. *United States,* 214 F.2d 862 [94 App.D.C. 228, 45 A.L.R.2d 1430]) or the standard presented in section 4.01 of the Model Penal Code of the American Law Institute. (See *Wade* v. *United States,* 426 F.2d 64.) This court is bound by the *M'Naughton* rule. (*People* v. *Wolff,* 61 Cal.2d 795, 803 [40 Cal.Rptr. 271, 394 P.2d 959].)

## V

We consider the effect of the two errors in the jury instructions: first, the failure to instruct *sua sponte* on attempted voluntary manslaughter as a lesser included offense, and second, injection of the second degree felony-murder theory into the instruction defining malice.

Generally, error in the trial of criminal cases requires appellate reversal only when the reviewing court finds a miscarriage of justice in the light of the entire record, that is, when there is a reasonable probability of a more favorable verdict absent the error. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 835-837 [299 P.2d 243].) In a number

of first degree murder appeals, the state Supreme Court has held that failure to instruct on a lesser included offense is prejudicial error per se, requiring reversal without weighing the record. (*People* v. *Tidwell*, 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Mosher, supra,* 1 Cal.3d at p. 390; *People* v. *Castillo,* 70 Cal.2d 264, 270-271 [74 Cal. Rptr. 385, 449 P.2d 449]; *People* v. *Graham, supra,* 71 Cal.2d at pp. 316-317; *People* v. *Modesto, supra,* 59 Cal.2d at pp. 730-731.) The rule of reversibility per se has been extended to nonhomicide cases where the trial court has failed to instruct on a lesser included offense. (*People* v. *Hood,* 1 Cal.3d 444, 450 [82 Cal.Rptr. 618, 462 P.2d 370] (assault with a deadly weapon); *People* v. *Townsend,* 20 Cal.App.3d 688, 699 [98 Cal.Rptr. 25] (battery upon a police officer); *People* v. *Cooper,* 268 Cal.App.2d 34, 40 [73 Cal.Rptr. 608] (assault with a deadly weapon); *People* v. *Garcia,* 250 Cal.App.2d 15, 20 [58 Cal.Rptr. 186] (felonious assault upon a police officer).)

The rule of reversibility per se does not *ex proprio vigore* entitle the defendant to a retrial. When, in a murder prosecution, the trial court's failure to instruct on a lesser included offense is followed by a first degree murder verdict, the appellate court orders a retrial because it cannot ascertain how the absent instruction might have affected the jury's choice between first and second degree murder. (*People* v. *Castillo, supra,* 70 Cal.2d at p. 271; *People* v. *Modesto, supra,* 59 Cal.2d at p. 731.) In some cases, the error at most prevents a verdict of guilt of the lesser included offense. Remand for retrial is not a compelled or automatic response to the error; rather, it results from the appellate court's rational inquiry into the error's impact upon the range of available verdicts. In several cases, appellate courts have measured the effect of other kinds of reversible error which, at most, prevented a verdict of a lesser offense. In such cases the courts have utilized their power to modify the judgment to reflect the lesser offense, giving the prosecution an election between modification and a new trial. (*People* v. *Garcia,* 27 Cal.App.3d 639, 647-648 [104 Cal.Rptr. 69]; *People* v. *Aikin,* 19 Cal.App.3d 685, 706 [97 Cal.Rptr. 251]; *People* v. *Shavers,* 269 Cal.App.2d 886, 889-890 [75 Cal. Rptr. 334].) There is no established rule and we discern no reason why the same measuring process should not occur where the error is failure to instruct on a lesser included offense.

We observed earlier that a violation of Penal Code section 217 occurs without differentiation between the degrees of the intended murder.

Thus, in a prosecution under section 217, omission of a lesser included offense instruction does not affect the jury's choice as it does in a murder trial. It cannot influence the jury's choice between two more serious degrees of the crime; rather, it simply deprives the jury of an election of one or several lesser offenses. Under the circumstances of this case the jury was deprived only of an opportunity to find on the single lesser offense covered by the omitted instruction, attempted voluntary manslaughter.

Here, assault with a deadly weapon (Pen. Code, § 245) was not a lesser included offense because the information did not allege defendant's use of a deadly weapon. (*People* v. *Marshall,* 48 Cal.2d 394, 403-405 [309 P.2d 456]; see *People* v. *Jennings,* 22 Cal.App.3d 945, 948-950 [99 Cal.Rptr. 739]; *People* v. *Mock Ming Fat,* 82 Cal.App. 618, 620-621 [256 P. 270].) Although justified by the evidence, the instruction on simple assault was relatively meaningless; in view of evidence that defendant had unbuckled his knife sheath before sallying into the fray and had then swung the knife at his opponent, simple assault was not a reasonably probable verdict. An instruction on attempted voluntary manslaughter would have presented the jury with the only reasonably available alternative between guilt as charged and outright acquittal.

Although prejudicial per se, the error did not prevent defendant's acquittal but rather shut the door to a verdict of guilt of the lesser offense, attempted voluntary manslaughter. There was strong evidentiary support for the verdict, either on the theory of a sudden quarrel or heat of passion or on the theory of diminished capacity. Absent other reversible error, defendant has established a case for modification of the judgment but not for a retrial.

As to the *"People* v. *Ireland"* error in the instruction defining malice, we find no reasonable probability that its absence would have caused acquittal. In the *Ireland* case the court found the error prejudicial; but that was a murder trial in which the trial judge had no occasion for jury instructions with a heavy verbal emphasis on specific intent to commit murder. Here the instructions directed the jury's attention to specific intent to murder as the crucial state of mind. Although malice was an element, it was secondary to the factor of specific intent. The evidence showed that defendant had searched the streets of Weaverville to find Mattos; had unbuckled his knife before entering the fray, demonstrating readiness to use it. There was no reasonable probability that excision of the offending language from the instruction on malice would have resulted in a verdict of acquittal. Rather, if discernible by the jury at all, it might

have led to an intermediate verdict finding defendant guilty of a lesser crime. Attempted voluntary manslaughter represented that kind of intermediate verdict. There was no reasonable probability that the erroneous instruction prevented an acquittal. It is prejudicial only when coupled with the court's failure to instruct on attempted voluntary manslaughter.

Within 20 days of the filing of this opinion, the People may file a request for modification of the judgment reducing the offense from assault with intent to commit murder to attempted voluntary manslaughter in violation of Penal Code section 664. Such a statement shall not affect any then pending application for rehearing. Should such a statement be filed, the remittitur will direct said modification, affirm the judgment as so modified and instruct the trial court to resentence defendant after appropriate proceedings under the probation statutes. (See *People* v. *Causey,* 230 Cal.App.2d 576, 579 [41 Cal.Rptr. 116].) Should such a statement not be filed, the remittitur will order reversal of the judgment.

Richardson, P. J., and Janes, J., concurred.

A petition for a rehearing was denied May 30, 1973, and appellant's petition for a hearing by the Supreme Court was denied June 28, 1973.