Filed 1/10/14  P. v. Ledon CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D062803 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF21003) |
| HORACIO LEDON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Imperial County, William D. Lehman, Judge.  Affirmed.


Robert F. Howell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Shortly after the defendant in this murder case, Horacio Ledon, stabbed his wife a

number of times, he was confronted by his daughter, who asked him what he had done. Ledon responded by telling his daughter, "she had another." Ledon then put the knife he had used in the killing on the bed where he was kneeling, got off the bed, washed his hands, got into a car and drove away. The following day, Ledon was approached by a border patrol agent and told the agent, "'I murdered my wife.'"

Contrary to Ledon's argument on appeal, on this record the trial court was not required to also give a sua sponte instruction on unconsciousness. Where, as here, the jury was fully and accurately instructed on the elements of second degree murder and, in particular, on the mental state the prosecution was required to establish, no additional instruction is required on unconsciousness, which negates the mental elements of a crime rather than providing an affirmative defense independent of the elements of a crime. Moreover, in any event, there was no factual basis for such an unconsciousness instruction.

We also reject Ledon's contention the prosecutor's arguments unduly prejudiced him. We agree the prosecutor erred when he argued that, in order to convict Ledon of voluntary manslaughter, the jury was required to determine the victim's statements were such that they would cause a reasonable person to kill. However, as we explain, this error was not prejudicial.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 11:00 p.m. on the evening of November 3, 2007, Ledon's teenage daughter, Ana, returned to the family's Brawley apartment after attending a

2

nearby party. She walked to her bedroom and noticed that her parents' bedroom door was closed, which was unusual. Ana then went outside for a few minutes and heard her mother scream, "Lacho, no." Lacho is Ledon's nickname. Ana then heard two or three more screams and went back into the apartment. Ana went to her parents' bedroom and saw her mother on the floor covered in blood; according to Ana, Ledon was kneeling on the bed and holding a knife. Ana asked Ledon what he had done to her mother. Ledon angrily responded, "she had another." Ledon then put the knife on the bed. Ana picked up the knife up and threw it on the floor. She then went to her room and called 911.

While Ana was on the phone with the 911 operator, Ledon washed his hands, walked out of the apartment and was seen by neighbors trying to get into a green car; when he was unable to get into the green car, Ledon went over to a gray car, got into it, and drove away.

Police officers responding to Ana's call found Ledon's wife, Maria, on the floor of the master bedroom covered in blood. They also found bloody bed sheets with cutting marks in them. In inspecting the apartment, the police officers found an empty knife sheath in the living room of the apartment near an entertainment center.

Maria was transported to a local hospital where she died. She had no measurable drugs or alcohol in her system. She had received 29 stab wounds. The wounds to her neck almost separated her head from her body; two wounds to the area around her mouth appeared as if her assailant had meant to carve a frown on her face. Although the knife Ledon used was only three and one-half inches long, Maria had a five and one-half inch

deep wound to her torso, which punctured her lung, spleen and diaphragm.

The next day around 2:00 p.m., Ledon was sitting in a silver car that was parked on a road near Interstate 8. A border patrol officer saw the car and approached it. Ledon, who was drinking a beer, got out of his car and immediately told the officer, "'I murdered my wife.'" Ledon also told the border patrol officer that he was on his way to kill his wife's boyfriend, her friends and her family. Ledon was placed in handcuffs and taken into custody by Brawley police officers. Ledon appeared calm and told the Brawley officers he had killed his wife and two people in Mexicali. He told the Brawley police officers, "'I took care of my wife's papers several years ago and this is how she repays [me].'"

At trial, Ledon testified on his own behalf and presented testimony from a friend, Norma Gomez. Gomez testified that on the evening of November 3, Ledon and Maria came to her house for a visit and the three shared an 18-pack of beer. According to Gomez, Ledon and Maria appeared happy and relaxed.

Ledon testified that until May 2007, when Maria started working at a casino, their marriage was fine. However, after she started working at the casino, she stopped doing laundry or cleaning the house and frequently stayed out late with her friends. According to Ledon, she also lost interest in sex.

Ledon suspected Maria was having an affair. A week before he killed her, he confronted her and she vehemently denied any extramarital affair. On the night before she died, Ledon attempted to have sexual relations with her and she refused. On the

4

following morning, he bought her flowers and a card; on the card he wrote in Spanish, "I just want to tell you that I love you."

After returning from Gomez's home on the evening of November 3, Ledon again attempted to initiate sexual relations and again Maria refused. When he asked her why, Maria told him she did not want to talk about it. He again asked her if she was having an affair, and this time Maria admitted that she had someone else, that her lover had money and that he "loves my private shaved parts." According to Ledon, Maria then called him a "huey" and laughed at him.

Ledon testified that at that point he "blacked out or something," went to the television stand, retrieved a knife, went back into the bedroom and stabbed Maria. At trial, he remembered stabbing Maria twice and stopping when he heard his daughter's voice; according to Ledon, when he heard his daughter, he "like woke up" and said to himself, "what could I have done."

Ledon recalled going outside, trying to get into one of the family's cars and then getting into a second family car. He went to get some beer and drove to the border and fell asleep under a tree near the border. The following morning, he went into Mexicali to see his sister. She was not home, so he bought more beer and drove back across the border and was eventually arrested.

At trial, Ledon expressed a great deal of remorse over Maria's death.

On cross-examination, the prosecutor vigorously questioned Ledon about the 29 stab wounds Maria had suffered, including wounds that had almost severed her head from

her body. The prosecutor, with the permission of the trial court, also asked Ledon whether he had an earlier affair and whether that affair explained Maria's changed behavior toward him.

The jury found Ledon guilty of second degree murder and found true an allegation that he had used a deadly weapon.

DISCUSSION

I

On appeal, Ledon argues the trial court should have, sua sponte, given an instruction on unconsciousness.[1] We must reject this contention.

As the court stated in *People v. Sievert* (2013) 219 Cal.App.4th 1476 at page 1479 (*Sievert*): "'Unconsciousness . . . is a complete defense to a criminal charge' [citations], but not an affirmative defense in the sense that it operates independently of the elements of the crime. Rather, unconsciousness 'negates the elements of voluntariness and intent.' [Citation.]" A trial court is not obligated to give a sua sponte instruction on such a defense, even when there is substantial evidence to support it. (*Id*. at p. 1480.)

The rule that otherwise requires a sua sponte instruction when there is substantial evidence of a defense "does not apply to all types of defenses . . . . Where a trial court has given complete and accurate instructions on the mental element of the crime charged, it does not have a sua sponte to instruct on defenses that, unlike true affirmative defenses,

---

[1]     Penal Code section 26 provides in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] "Four-- Persons who committed the act charged without being conscious thereof."

operate only to negate the mental element of the crime." (*Sievert*, *supra*, 219 Cal.App.4th at p. 1479.) Because unconsciousness goes to the mental element of a charged crime, it "does not necessitate sua sponte instruction from the court even if the traditional standard for sua sponte instruction is met." (*Id.* at p. 1480.)

In *Sievert*, the defendant was charged with resisting an executive officer and resisting a peace officer. During the subject confrontation, the defendant was tased, fell back on his head and then, when officers attempted to restrain him, he punched, kicked, and whipped back and forth. Once the defendant was restrained, the officers discovered he had sustained a head wound; thereafter, he was transported to a hospital where he received several staples in his head. (*Sievert*, *supra*, 219 Cal.App.4th at p. 1478.)

In rejecting the defendant's contention that the trial court should have given a sua sponte instruction on unconsciousness, the court in *Sievert* stated: "Here, it is undisputed that defendant failed to request an instruction on unconsciousness. It is also undisputed that the trial court's instructions on the mental element of the crime charged were complete and accurate. As a result, despite his testimony that he was 'knocked out' after sustaining a head wound that sent him to the hospital, the trial court was not required to give the unconsciousness instruction sua sponte." (*Sievert*, *supra*, 219 Cal.App.4th at p. 1480.)

Here, it is undisputed that Ledon did not ask for an instruction on unconsciousness. It is also undisputed that the trial court fully instructed the jury as to the elements of second degree murder and, in particular, the intent to kill. Thus,

7

notwithstanding Ledon's testimony that he "blacked out or something," as in *Sievert*, the trial court was not required to give an unconsciousness instruction sua sponte.

We hasten to point out that even if the usual rule with respect to sua sponte instructions applied here, no sua sponte instruction would have been required on this record. As the court in *Sievert* indicated, a sua sponte instruction is required under the usual rule with respect to a defense only when there is substantial evidence that supports the defense. (*Sievert*, *supra*, 219 Cal.App.4th at p. 1479.) Here, there was no substantial evidence Ledon was unconscious within the meaning of Penal Code section 26 at the time he killed Maria.

Relying on Penal Code section 26, the court in *People v. Heffington* (1973) 32 Cal.App.3d 1 (*Heffington*) considered and rejected a defense of unconsciousness. In *Heffington*, the defendant was charged with assault with intent to commit murder. Early one evening, the defendant and a youth exchanged insults, and the defendant later returned to the site of the exchange after consuming five beers, found the youth and assaulted him with his fists and a knife. The defendant testified that the events leading up to the assault were somewhat hazy: "He did remember approaching [the victim] and asking him, 'Did you give me the finger?' [The victim], according to defendant, answered, 'Yeah, man,' and came running at him like a 'wild bull,' and kicked him in the testicles. Defendant recalled pulling his knife to use it in his own defense; he recalled intending to use it in his own defense and recalled that he was afraid for his life. The next thing defendant recalled was [a police officer] trying to restrain him but he had no

8

idea why.  He recalled dropping the knife at [the officer's] request.  Defendant did not remember much of what occurred thereafter until he was booked."

The court in *Heffington* stated:  "In the sense intended by Penal Code section 26 . . . unconsciousness includes not only a state of coma or immobility, but also a condition in which *the subject acts without awareness*."  (*Heffington*, *supra*, 32 Cal.App.3d at p. 9, italics added.)  In nonetheless finding the defendant's testimony and the testimony of two experts was not sufficient to require a sua sponte unconsciousness instruction, the court stated:  "In his own testimony defendant displayed ability to remember some parts of the incident and not others.  He remembered returning to town to search for the man who had given him 'the finger'; did not recall striking the man but did recall the man rushing at him and kicking him in the testicles; recalled reaching for his knife and pulling it out but not that he himself had swung the knife; recalled dropping the knife at the officer's request but not much of the events thereafter until he was booked at the jail.  As a reviewing court we assume that his selective recollection was natural, not feigned.  Nonetheless, it fell far short of a claim or description of unawareness coexistent with the fight.  In short, there was no claim or description of coexistent unconsciousness, either from the psychiatrists or defendant."  (*Id*. at p. 10.)

The record here is indistinguishable in any material respect from the one considered by the court in *Heffington*.  Ledon remembered confronting Maria about his suspicions, Maria's admission she was having an affair, her insults, going out to the living room and retrieving the knife, stabbing Maria two times, hearing Ana's voice, leaving the

9

apartment, being unable to get in the green car and finally leaving in the gray car. In the context of Ledon's own fairly detailed memory of how the killing took place, his reference to a "blacking out" in no sense establishes a lack of awareness during the crime and hence did not require an unconsciousness instruction.

In sum, no sua sponte unconsciousness instruction was required here because the jury was properly instructed on the elements of murder and because, in any event, there was no substantial evidence to support an unconsciousness finding.

II

Although we agree with Ledon that the prosecutor made an erroneous argument with respect to the provocation needed to reduce murder to manslaughter, like the court in *People v. Beltran* (2013) 56 Cal.4th 935, 948 (*Beltran*), which confronted a similar prosecutorial error with respect to provocation, we find no prejudice.

A. *Instruction and Argument*

The trial court instructed the jury with a version of CALCRIM No. 570, which stated in pertinent part: "Although no specific type of provocation is required, slight or remote provocation is not sufficient. . . . In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment."

In discussing the provocation needed to establish that an intentional killing was manslaughter rather than murder and consistent with the trial court's instruction on the issue, defense counsel told the jury that the provocation needed to be such that it would

10

cause an average person to act out of "passion rather than judgment. [¶] You notice it does not say here that it would cause a reasonable person to kill. That's not what it says. It would cause an ordinary reasonable person of average disposition to react emotionally and from intense emotion."

Notwithstanding the trial court's use of CALCRIM No. 570, during the prosecution's rebuttal and over defense counsel's objection, the prosecutor argued to the jury that in order to mitigate an intentional killing from murder to manslaughter, the defendant must have been acting under a provocation that would cause a person with an average disposition *to kill*.

B. *Legal Principles*

As the court in *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*) recently concluded, the prosecutor's argument here was erroneous: "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Id.* at p.

11

949.) Thus, the fundamental question for a jury is whether or not the defendant's reason, at the time of his act, was disturbed "'to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*Id.* at p. 948.) The court summarized its holding as follows: "[P]rovocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment." (*Id.* at p. 950.)

Like the prosecutor here, the prosecutor in *Beltran* erroneously argued the defendant was guilty of manslaughter only if the provocation the defendant suffered would have caused an average person to kill. In finding the prosecutor's error was not prejudicial, the court in *Beltran* applied the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Beltran*, *supra*, 56 Cal.4th at p. 955.) "'[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*Ibid.*)

In determining that under *Watson* the defendant was not prejudiced, the *Beltran* court relied on the fact that, during its deliberation, the jury asked the trial court what provocation was needed, and the trial court responded with an instruction that correctly stated that "'[t]he provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion *that his judgment or reasoning process was obscured*.'" (*Beltran*, *supra*, 56 Cal.4th at p. 956.) The court found this accurate

12

response, like the correct instruction set forth in CALCRIM No. 570, resolved any confusion or ambiguity created by the prosecutor's argument. (*Ibid*.)

The court in *Beltran* also relied on the fact that the evidence of provocation was both weak and contradicted. In *Beltran*, although the defendant testified that the victim, his former girlfriend, had invited him to her apartment and then provoked him by telling him she had aborted the child they had conceived, other witnesses testified that the victim was afraid of the defendant and that he had used a key to break into her apartment. (*Beltran*, *supra*, 56 Cal.4th at pp. 956-957.) The court also noted that after the killing, the defendant disposed of the knife he had used to murder his girlfriend and fled to Mexico. The court reasoned that his disposal of the knife and flight reflected a consciousness of guilt. (*Ibid*.)

C. *Analysis*

For reasons strikingly similar to those identified by the court in *Beltran*, here, the prosecutor's erroneous remarks were not prejudicial. The trial court instructed the jury with a version of CALCRIM No. 570. That version is a correct statement of the law. (*Beltran*, *supra*, 56 Cal.App.4th at p. 948.) That correct statement of the law was reiterated to the jury by defense counsel. The trial court also instructed the jury with a version of CALCRIM No. 200, which stated that if there was any conflict between counsel's statements and the trial court's instructions, they were required to follow the instructions. In short, with respect to what was presented to the jury on the issue of provocation, this case is indistinguishable from *Beltran*. Thus, as in *Beltran*, the trial

13

court's correct instruction was more than adequate to remedy any confusion created by the prosecutor's argument. (See *Beltran*, at p. 956.)

Further, as in *Beltran*, Ledon's version of events was weak and contradicted by a great deal of circumstantial evidence and impeachment. As we have indicated, the record shows that some of Maria's wounds were inflicted through tears in her bed sheets. This fact, of course, supports the prosecution's theory Maria had pulled the sheets over herself and was trying to go to sleep before Ledon violently attacked her. That scenario, in turn, is more consistent with her simple unwillingness to have sex with Ledon than with a heated argument in which she admitted having an affair.

Another very substantial challenge to Ledon's credibility was the fact that although at trial Ledon claimed he could only recall inflicting two of the 29 stab wounds Maria suffered, some of the other wounds, including the disfiguring wounds to her mouth, appeared to quite intentional, purposeful and extremely violent. Given their nature, Ledon's limited recollection of the wounds he inflicted was not very credible.

Ledon's version of events was further undermined by the contradictory manner in which it developed at trial. On the first day of his testimony, Ledon was asked on direct examination whether Maria had insulted him, and he said that he did not recall any insult. However, after being subjected to a lengthy cross-examination about the numerous and grievous wounds he had inflicted on Maria, on the second day of his testimony, on redirect examination, Ledon for the first time recalled Maria had called him a "huey" and laughed at him before he snapped. Although on the first day of his testimony Ledon did

14

not remember the insult, on the second day of trial he offered that the insult "hurt so much. Those two words." The jury was not likely to credit this tardy and contradictory recollection about such a vital part of Ledon's claim to have been provoked.

We also note that Ledon, after nearly decapitating Maria, told his daughter that Maria "had another." Then, as his daughter was calling 911, he quickly left the apartment *and* his teenage daughter with her dying mother. This behavior itself is not consistent with Ledon's portrayal of himself as a loving husband who "lost it" in a momentary lapse of judgment and who woke up from a daze at the scene telling himself, "what could I have done?" This is plainly the conduct of someone who was very conscious of his guilt and had little regard for either Maria or his daughter's well-being. (See *Beltran*, *supra*, 56 Cal.4th at p. 957.)

The record also shows that when approached by the border patrol officer the following day, Ledon immediately admitted that he "murdered" his wife and stated that he was on his way to kill her boyfriend, among others. Shortly thereafter, Ledon was taken into custody by Brawley police officers and complained about the fact that he had helped Maria get her immigration papers. These statements are neither consistent with a husband who was provoked by an insult nor one who is experiencing any remorse.

In sum, given the trial court's correct instruction on the issue of provocation and the quantum of evidence that was inconsistent with Ledon's version of events, like the defendant in *Beltran*, Ledon cannot show a probability that in the absence of the prosecutor's statement a different verdict would have been returned.

15

III

Finally, Ledon claims the prosecutor engaged in other acts of prejudicial misconduct. We find no such misconduct.

A. *Community Standards*

In arguing Ledon was guilty of murder, the prosecutor stated: "How many people in this room are held personally accountable for the choices they make every single day in their personal and in their private lives? A lot of people have problems in their marriages, in their relationships, and they deal with those problems without killing each other. Why should a community—why should this community make an exception and not hold him responsible?"

Defense counsel objected to this argument on the grounds the appeal to the community was improper argument. The trial court overruled the objection. The prosecutor continued his argument and stated: "Why should a community, why should this community make an exception and not hold him responsible for choices nobody else made for him? If he was so convinced and paranoid that [Maria] cheated on him and if he couldn't get over it or deal with it for whatever reason, then he should have left. He should have left. It doesn't give him an excuse to kill her."

Contrary to Ledon's claim, the prosecutor's argument was proper. A prosecutor may properly refer to "the jury as the 'conscience of the community' or as representatives of the community." (*People v. Ledesma* (2006) 39 Cal.4th 641, 741.) A prosecutor may not, however, "'make arguments to the jury that give it the impression that "emotion may

16

reign over reason," [or] present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response."'" (*People v. Redd* (2010) 48 Cal.4th 691, 742.) Moreover, a prosecutor may not suggest that, in determining guilt, jurors consider public opinion or convict a criminal defendant in order to protect community values. (*Ibid*.) "The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. . . . [¶] But a request that the jury "condemn" an accused for engaging in illegal activities is not constitutionally infirm, so long as it is not calculated to excite prejudice or passion.'" (*Id*. at p. 743, fn. 25.)

Here, the prosecutor's statements were in no way an appeal to passion or prejudice but instead were plainly focused on Ledon's defense that Maria's infidelity, in part, relieved him of responsibility for killing her. The prosecutor's rejection of Ledon's defense did not inject any irrelevant considerations into the proceedings and was proper.

B. *License to Kill/Gift*

In his opening argument, the prosecutor told the jury that even if Maria had been unfaithful, Ledon did not have a "license to kill." Defense counsel did not object to this argument.

During *his* argument, defense counsel told the jury that even if it convicted Ledon of manslaughter, Ledon would "pay a heavy price." In his rebuttal argument, and again

17

with no objection from defense counsel, the prosecutor urged the jury not to provide Ledon with the "gift" of a manslaughter conviction.

As the Attorney General points out, in the absence of an objection at trial, the prosecutor's comments may not be raised for the first time on appeal. (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) Moreover, contrary to Ledon's argument, given the context in which the comments were made, they were not improper references to possible punishment. The prosecutor's initial reference to a "license to kill" was made in the context of his assertion that any infidelity on Maria's part did not justify or excuse killing her. A reasonable jury would not interpret this as anything other than an exhortation that Ledon be held responsible, under the law, for his conduct. (See *People v. Redd*, *supra*, 48 Cal.4th at pp. 743-744 & fn. 25.) This is plainly not an instance, such as occurred in *People v. Holt* (1984) 37 Cal.3d 436, 457-458, where the prosecutor in the guilt phase of a death penalty case made a direct reference to punishment when he told the jury that bringing back anything other than a particular verdict would be giving the defendant a parole date.

The prosecutor's second statement, referring to manslaughter as a gift, was again nothing more than an exhortation that Ledon be held fully responsible for his crime. The only direct reference to punishment was made by defense counsel in assuring the jury that a manslaughter conviction would result in Ledon "pay[ing] a heavy price."

C. *Cross-Examination*

Finally, Ledon argues the prosecutor acted improperly in extensively cross-

18

examining him about the wounds he inflicted on Maria, about his departure from the apartment, and about whether he previously had an affair that Maria learned about. Again, we find no misconduct.

"Although a defendant cannot be compelled to be a witness against himself, if he takes the stand and makes a general denial of the crime with which he is charged, the permissible scope of cross-examination is 'very wide.' [Citation.] When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. [Citation.] A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 822.)

Under these principles of law, the fact Ledon testified that he did not recall inflicting all 29 wounds on Maria did not immunize him from a fairly detailed cross-examination on those wounds or the fact that, after he murdered Maria, he washed his hands. As the Attorney General points out, the medical examiner who performed an autopsy on Maria testified with respect to the wounds, the damage they caused and how they were likely inflicted. As we have previously indicated, the violent and cruel manner

19

in which Ledon killed Maria was relevant in assessing both Ledon's claim that he "lost it" when he was insulted and his claim that he had no memory of inflicting more than two knife wounds. Thus, the prosecutor's questions about Maria's wounds and Ledon's fairly calm and matter-of-fact conduct afterwards were fully supported by the record and were relevant in determining Ledon's credibility.

Ledon also challenges questions the prosecutor posed about a romantic relationship Ledon had with another woman during his marriage to Maria. The prosecutor, in limine, represented to the trial court he had a good faith basis to believe Ledon had been unfaithful during his marriage to Maria and that Ledon's unfaithfulness was relevant with respect to both Maria's apparent distant relationship with Ledon before her death and Ledon's anger towards her. On the basis of the prosecutor's representations, the trial court permitted the questions. In light of Ledon's own testimony that Maria had been distant before her death, the questioning, which was expressly permitted by the trial court, was both relevant and proper.

Because the prosecutor's questions sought to elicit relevant information, the record here is in marked contrast to the one considered in *People v. Zambrano* (2004) 124 Cal.App.4th 228, upon which Ledon relies. In *Zambrano*, the court held that it was improper to ask a defendant if prosecution witnesses were lying when they provided conflicting testimony; the court determined a defendant's assessment of other witnesses' credibility was not relevant and invaded the province of the jury. (*Id*. at pp. 239-240.) Here, Ledon was not asked to opine on any other witness's credibility but only to explain

20

other circumstantial evidence in the record.

## DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:

NARES, J.

IRION, J.