Filed 5/3/22  P. v. Torrez CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>BRYAN TORREZ,<br><br>       Defendant and Appellant. | A161474<br><br>(City & County of San Francisco Super. Ct. No. 232575) |

Bryan Torrez appeals from a judgment of conviction and sentence imposed after a jury found him guilty of misdemeanor assault and battery (Pen. Code, §§ 240, 242).[1]  He contends (1) the court erred in precluding expert witness testimony to support his unconsciousness defense; (2) the prosecutor committed misconduct in asking a character witness about a purported arrest of the defendant for attempting to break into cars, because the arrest was actually for resisting a police officer; and (3) the sentencing minutes should be corrected so that he does not have to pay the fees and assessments imposed at sentencing or a $25 fee under section 1463.07.  We will order a correction of the sentencing minutes and affirm the judgment.

---

[1]     Except where otherwise indicated, all statutory references are to the Penal Code.

1

## I. FACTS AND PROCEDURAL HISTORY

Torrez was charged in Count 1 with assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)) and in Count 2 with battery with serious bodily injury (§ 243, subd. (d)). As to Count 1, it was alleged that he personally inflicted great bodily injury (§ 12022.7, subd. (a)), and as to Count 2, it was alleged that he personally inflicted serious bodily injury (§ 1192.7, subd. (c)(8)). The matter proceeded to trial.

### A. Prosecution Case

#### 1. Torrez's Attack on Victim Davidson

Zachary Davidson testified that he was walking on Pine Street toward Mason Street in San Francisco around 4:30 p.m. on January 26, 2020, looking down as he unwound his headphones. When he looked up, he saw a man (Torrez) 10–15 yards away, staring at him intensely. Davidson tried to walk around Torrez, but Torrez stepped in front of him, blocking his way and causing him to stop.

Torrez slowly took off his jacket, put the jacket and his bag on the ground, and "siz[ed] [Davidson] up." He then "bull-rushed" Davidson, who felt a blow to the right side of his head as he turned to get away. Torrez hit Davidson two or three more times as Davidson tried to run between parked cars and into the street. He threw Davidson down to the sidewalk and continued striking him in the face. Davidson, who had never seen Torrez before, screamed "help," "what the fuck is wrong with you?" and "why are you doing this?"

Someone yelled at Torrez to stop, and he stopped. Torrez got off Davidson, picked up his bag and jacket, and slowly walked away, turning left on Mason Street. Torrez did not say anything to Davidson during the incident, which lasted about 60 seconds.

Davidson called 911 and reported the attack; a recording of the call was played for the jury. He also described the attack to police when they arrived at the scene.

Davidson was taken to the hospital by ambulance. He suffered five to seven "strike marks" or swollen areas on his lip, chin and the right side of his eye and face, his nose was fractured, he sustained cuts on his forehead, scrapes on his ankle, and two black eyes, and he had pain in the back of his head. For a few days, he suffered from headaches and blurred vision.

2. Police Officers Respond and Arrest Torrez

Officers Jason Nord and Javier Elizondo arrived at the scene. Officer Nord activated his body-worn camera. Portions of the recorded video, showing Davidson on the street speaking with the officers about the attack, was played for the jury.

Bystanders informed police that the suspect was nearby and led Officer Nord around the corner and up a block on Mason Street to California Street, where one of the bystanders pointed to Torrez near a movie set. The officers detained Torrez, who did not resist being handcuffed. Torrez cooperated with Nord, followed his commands, and responded to questions about his name and date of birth.

Officer Nord took a statement from Davidson and witnesses who had seen the attack. Davidson was able to view Torrez from the back of the ambulance and identified Torrez as his assailant.

At the police station, Torrez appeared subdued and fell asleep on a bench. After being advised under *Miranda*, Torrez declined to speak to Officer Nord. There were no indications that Torrez was under the influence of drugs or alcohol.

3

Officer Elizondo identified Torrez in the courtroom as the person he and Officer Nord located on California Street and arrested after the assault. Portions of the video footage from Elizondo's body-worn camera were played at trial. According to Elizondo, Torrez was at times uncooperative, refusing to stand up for a "coldshow" and to be transported. Torrez told Elizondo to leave him alone and did not respond when repeatedly asked if he needed help.

### 3. Patrick Reynolds—Eyewitness

Patrick Reynolds testified that he was in his apartment when he heard someone screaming, "[h]elp," "stop." He looked out the window and saw a man lying on his back and a person standing over him, hitting him repeatedly in the face. At trial, Reynolds identified Torrez as the assailant.

Torrez had a "wild crazy look in his eyes." Reynolds and his husband screamed for Torrez to stop; Torrez stopped, looked up at them, and returned to beating the victim. Reynolds ran downstairs; by the time he reached the street, another man was next to the victim and Torrez had ceased his attack. Torrez picked up his bag and casually walked away. After police arrived, Reynolds and another neighbor ran with the officers up Mason Street, where Torrez was spotted on the corner of Mason and California Streets and apprehended. Torrez's demeanor at the time was subdued.

### 4. Jim Morrone—Eyewitness

On the day of the incident, Jim Morrone was returning from a corner store on Pine and Taylor Streets when he heard someone repeatedly say in distress, "Stop, stop," "why are you doing this?" Morrone walked toward the noise and heard an upstairs neighbor yelling from his window for the assailant to stop. Morrone observed the victim curled up on his side on the sidewalk and another person dancing around him like a boxer and kicking

4

him. The victim's face was cut and covered with blood. Morrone told the assailant to back off; the assailant backed up a couple of feet and moved his hands back and forth in a boxing motion. After sizing up Morrone for a minute, the assailant walked down the sidewalk, picked up his backpack, and walked away quickly toward Mason Street. Police officers arrived within minutes, and Morrone told them the direction the assailant had gone. Morrone jogged with the police to find the attacker, who was observed at the top of a hill where a show was being filmed. Morrone told police, "[t]hat's him," and they made their arrest.

### 5. Abigale Nowak—Eyewitness

Abigale Nowak was walking home when she saw a person lunging at another person and latching on to him. The victim said loudly, "get off me, get off me." The assailant rammed the victim into a parked car and shoved him into a window. Nowak called 911. The victim fell to the ground, and the assailant kicked him as he wailed on the ground in pain. After neighbors tried to help, the assailant jogged up the hill on California Street, appearing "amped up and angry," and sat down at the top of the hill, where a movie was being filmed.

### B. Defense Case

#### 1. Torrez's Testimony

Torrez testified that he learned his girlfriend was pregnant and went "several days without sleeping." Beginning the day his girlfriend gave him the news, he slept less than four hours a day and, at some point, was not sleeping at all. He did not identify the days he had no sleep.[2]

---

[2] During an evidentiary hearing outside the presence of the jury, Torrez stated that he learned from his girlfriend in December 2019 that he was the father of her expected child. This caused him to lose sleep and worry. He could not recall when he last slept before the incident on January 26, 2020.

As to the events of January 26, 2020, Torrez testified that he remembered a man (Davidson) walking towards him from a block away. Torrez moved from one side of the street to the other several times, and Davidson did the same thing, moving when Torrez moved. When they were a few feet apart, Davidson made a gesture or movement that Torrez interpreted as a threat to attack or frighten him—he believed Davidson had raised his fists at shoulder height and jerked forward. Torrez recalled chasing Davidson around a car, hearing someone screaming for him to stop, and seeing a person in front of him with his hands up. He claimed not to remember hitting or kicking Davidson or seeing other people approach. He did remember picking up his bag and leaving in the direction he had come from. Initially he testified that he did not remember anything after that, but he later testified that he remembered seeing a crowd and the police handcuffing him and putting him in the police car.

Torrez denied having taken drugs or consuming alcohol. When asked on cross-examination, "right now you're currently on probation in Alameda County; is that right," Torres replied that he "wasn't aware" of it.

2. Torrez's Character Witnesses

Torrez's father and brother testified to his character. His father, Felax Hernandez, testified that his son was very peaceful and nonviolent, always studying and reading books, and had a peaceful reputation in the community. Hernandez further testified that he considered Torrez an honest person with a reputation for honesty in the community.

On cross-examination, the prosecutor asked Hernandez if he was aware that Torrez had a conviction for theft in Alameda County in 2019. Hernandez responded that he believed Torrez's girlfriend was responsible for that incident and Torrez blamed himself for what happened. The prosecutor

6

also asked Hernandez—in a question at issue in this appeal—whether Hernandez had heard that Torrez was arrested in December 2019 for "allegedly trying to break into cars in Alameda." The court overruled defense counsel's objections, and Hernandez replied that he "wasn't aware of that." The prosecutor asked no further questions of the witness.

Torrez's brother Jose testified that Torrez was a nonviolent person, in the sense of being peaceful, because he is very respectful and calm. According to Jose, Torrez had a reputation in the community for nonviolence because he attended San Francisco State University and never had any issues. The prosecutor did not ask the brother about Torrez's other arrests.[3]

C. <u>Jury Verdict and Sentence</u>

The jury deadlocked on Count 1 (assault with force likely to cause great bodily injury), and the court declared a mistrial as to that count, which was later dismissed. The jury found Torrez not guilty on Count 2 (battery with serious bodily injury) but guilty of the lesser-included misdemeanor offenses of assault (§ 240) and battery (§ 242).

The court struck the section 240 conviction as a lesser-included offense of section 242 and sentenced Torrez on the battery conviction to 180 days in county jail with 279 days credit for time served. The sentence was deemed served. Fees and assessments were imposed, as discussed *post*. This appeal followed.

---

[3] Another defense witness, Dr. Michael Laufer, testified about the nature of Davidson's injuries, noting his nasal fracture did not require treatment and there was no disfigurement or expected disability.

7

## II. DISCUSSION

### A. Exclusion of Expert Testimony on Sleep Deprivation

Torrez's defense at trial was that he did not sleep for several days before attacking Davidson, and the sleep deprivation had caused a state of unconsciousness such that he was unaware of his actions. On appeal, he contends the trial court abused its discretion in excluding proffered expert witness testimony on sleep deprivation and thereby violated his constitutional right to present a defense.

#### 1. Background

Before trial, defense expert Dr. Logan Schneider testified at an evidentiary hearing on the mental and physical effects of sleep deprivation. Dr. Schneider, who had not interviewed Torrez or reviewed any statements from him, opined that everyone eventually suffers the same effects from sleep deprivation, but each person's susceptibility can vary. Typically, after 24 hours of not sleeping, most people will experience a decrease in attention and thinking ability, slight mood alterations, and temperature changes. After 48 hours of not sleeping, these impairments will worsen, people may misperceive reality in the form of visual illusions (misinterpreting things that are there, such as misinterpreting others' facial expressions as more aggressive than they actually are) or hallucinations (seeing things that are not there), and emotions may become more volatile (moodiness, elation, depression, aggression, anger, or irritability) as sleep deprivation continues. After 72 hours without sleep, most people will hallucinate and accept the hallucination as reality. As time goes on, delusions and detachment from reality may make sleep-deprived persons less aware of their impairments. Dr. Schneider distinguished sleep deprivation from sleep walking, however,

8

confirming that one cannot be conscious when sleep walking, which originates out of deep sleep.

At the conclusion of the evidentiary hearing, the court ruled that it would not give an instruction on unconsciousness and excluded Dr. Schneider's proffered testimony. Citing CALCRIM No. 3425 and case law, the court recognized that a person is unconscious when not aware of their actions, which can result from mental illness such as a psychotic episode; however, the evidence from Dr. Schneider was that a sleep-deprived person was not unconscious, but conscious and aware, and the evidence was that Torrez erroneously believed he was justified in hitting his victim, not that he was unaware he was doing it.

Torrez subsequently testified at an evidentiary hearing that he could not remember the last time he went to sleep before attacking Davidson. At trial, he testified as described above – he had not slept for "several days," he could not remember all that occurred after he first encountered Davidson, he felt threatened by Davidson's movements, and he chased Davidson around a car. He remembered someone yelling "stop," seeing a person with their hands up, and picking up his bag and walking away, but had no memory of assaulting Davidson.

Defense counsel renewed his request that Dr. Schneider be permitted to testify about sleep deprivation as a basis for unconsciousness, and the court again denied the request.

Later in the proceeding, the court reiterated its reasons for not allowing Dr. Schneider's testimony. Among other things, Dr. Schneider had not met or diagnosed Torrez but based his opinions on videos, police body-worn camera footage, some papers, and a police report. The court recounted Dr. Schneider's testimony, including the testimony that the effects of sleep

deprivation vary based on a person's personal history and susceptibility. In particular, the court observed, Dr. Schneider did not testify that a sleep-deprived person is unconscious, but that such a person has a reduced awareness of their environment. Citing case law, the court noted that hypothetical questions are impermissible unless supported by evidence in the record, and there was no evidence of how long Torrez went without sleep because Torrez did not know. The court found that Dr. Schneider's proffered testimony was more prejudicial than probative because it was "based on generalities" and "based on conjecture." Nonetheless, in light of Torrez's testimony that he did not remember some of his encounter with Davidson, the court found there was substantial evidence justifying an instruction on unconsciousness.

The court instructed the jury on unconsciousness pursuant to CALCRIM No. 3425, as follows: "The defendant is not guilty of Penal Code 245(a)(4) as charged in Count 1, or Penal Code 243(d) as charged in Count 2 if he acted while unconscious. Someone is unconscious when he is not conscious of his or her actions. Someone may be unconscious, even though able to move. [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious. Unless based on all the evidence you have a reasonable doubt that he was conscious . . . in which case you must find him not guilty."

    2. <u>Law</u>

A defendant has a constitutional right to present a defense, which includes the right to put on evidence that might influence the determination of guilt, if the evidence is reliable, intelligible, not cumulative, and bears on

10

an important element of the defense. (*U.S. v. Stever* (9th Cir. 2010) 603 F.3d 747, 755–758.) Notwithstanding, a state court's exclusion of defense evidence under the applicable evidentiary rules—including Evidence Code section 352—generally does not infringe upon this right. (See *People v. Chavez* (2018) 22 Cal.App.5th 663, 681; *People v. Cornwell* (2005) 37 Cal.4th 50, 82 [disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn.22].)

Under Evidence Code section 352, a trial court may exclude evidence if its probative value is substantially outweighed by the probability its admission will consume undue time, mislead the jury, or confuse the issues. (*People v. Scott* (2011) 52 Cal.4th 452, 490.) We review the exclusion of evidence for an abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

As the jury was instructed, unconsciousness is a defense if the defendant was unaware of his actions. (*People v. Heffington* (1973) 32 Cal.App.3d 1, 9 (*Heffington*); CALCRIM No. 3425.) This unconsciousness may be caused by, for example, a blackout or epileptic seizure. (*People v. Cox* (1944) 67 Cal.App.2d 166, 172; *People v. Freeman* (1943) 61 Cal.App.2d 110.) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417; see *Heffington, supra*, 32 Cal.App.3d at p. 9; *People v. Boyer* (2006) 38 Cal.4th 412, 472 (*Boyer*) [suggesting unconsciousness extends to persons who are not conscious of acting but perform acts while asleep or while suffering from a delirium of fever]; *People v. Gana* (2015) 236 Cal.App.4th 598, 610–611 (*Gana*) [jury should be instructed on unconsciousness where there is substantial evidence the

11

defendant's medical condition and medications caused her to suffer delirium, which resulted in fluctuating levels of consciousness].)  An inability to remember is generally insufficient, without more, to demonstrate unconsciousness.  (E.g., *Heffington, supra,* 32 Cal.App.3d 1, 10.)

       3.  <u>Analysis</u>

The court did not abuse its discretion in excluding Dr. Schneider's proffered testimony in support of Torrez's unconsciousness defense.  Although Dr. Schneider opined about the effects of sleep deprivation, he did not opine that a sleep-deprived person is unconscious or otherwise lacks awareness of his or her actions.  He testified that a person deprived of sleep for 48 hours may have illusions (misinterpreting things that are there) or possibly hallucinations (seeing things that are not there), but not that the person would be unaware of what he or she was doing.  Similarly, Dr. Schneider opined that persons deprived of sleep for 48 hours may lose awareness of how impaired they are, but he did not opine that they would lose awareness of their actions.  To the contrary, Dr. Schneider *distinguished* sleep deprivation, which Torrez claimed, from instances of sleepwalking, in which a person is in deep sleep and is not conscious.  Because Dr. Schneider did not testify that sleep deprivation can lead to unconsciousness, it was not an abuse of discretion to preclude him from testifying as to Torrez's unconsciousness defense.

Torrez argues there was evidence he had not slept for at least 48 hours, Dr. Schneider would have testified that a person might experience hallucinations at that point, and *case law* suggests hallucinations can render a person unconscious.  There was, however, nothing presented to the jury (or in Dr. Schneider's proffered testimony) that linked hallucinations to

12

unconsciousness.[4] And even if there had been, there was no evidence that Torrez was suffering a hallucination when he beat up Davidson. Dr. Schneider did not testify that Torrez experienced a hallucination (which he defined as seeing things that are not there) or that every person deprived of sleep for 48 hours suffered hallucinations. Nor did Torrez claim that he hallucinated or saw things that were not there. At most he testified to perceiving Davidson's actions inaccurately—thinking a gesture by Davidson was a threat to attack—but according to Dr. Schneider that would have been a visual illusion, not a hallucination. Moreover, the evidence demonstrated that Torrez was aware of his environment, as Torrez testified that he knew Davidson was mirroring his movements, Torrez stopped the beating when Morrone told him to stop, Torrez knew his belongings were on the ground and retrieved them, and Torrez cooperated with the police when they apprehended him. Indeed, Torrez was able to remember the incident—except

---

[4] Torrez instead refers us to two California cases. In *Boyer, supra,* 38 Cal.4th 412, the court held that any error in failing to instruct on the complete defense of unconsciousness was harmless, because the defendant did not claim he suffered a hallucination when he killed the victims, he seemed mentally normal after the killings, and expert witnesses did not testify that he hallucinated. (*Id*. at p. 470.) The court further held it was unnecessary, in instructing on unconsciousness by voluntary intoxication, to instruct that a person could be unconscious while in delirium because jurors receiving the instruction would know it related to the defendant's claim that he killed while hallucinating he was in the movie Halloween II. (*Id*. at p. 472.) In *Gana, supra,* 236 Cal.App.4th 598, the court ruled the jury should be instructed on unconsciousness where a medical expert testified that the defendant was " 'experiencing a delirium, which is a kind of fluctuating level of consciousness, due to medical illness that caused her to . . . have worsening symptoms of depression and worsening psychoses.' " (*Id*. at pp. 610–611.) Neither case is on point, because Torrez did not claim to have a hallucination or delirium, and neither case addressed an issue of the admissibility of expert testimony to support an unconsciousness defense.

for the part where he was hitting and kicking his victim—and a claim of partial memory loss does not constitute unconsciousness. (*Heffington, supra*, 32 Cal.App.3d at p. 10 [defendant's ability to remember some parts of the incident and not others "fell far short of a claim or description of unawareness coexistent with the fight"].)

In sum, the court did not abuse its discretion in excluding Dr. Schneider's testimony. Because the court instructed the jury with CALCRIM No. 3425 on unconsciousness, allowed testimony from Torrez about his lack of sleep, allowed defense counsel to argue the defense in closing argument, and did not err in excluding Dr. Schneider's testimony, Torrez was not deprived of his defense or a fair trial.

B. Prosecutor's Questioning on Torrez's Arrest

Torrez next argues that the prosecutor engaged in misconduct when she asked Hernandez, a defense character witness, if he had heard that Torrez was arrested for allegedly trying to break into cars, claiming she had no good faith belief that such an arrest had occurred.

1. Background

After the close of the People's case, the prosecutor advised that she was prepared to introduce two further items of evidence against Torrez. First, the prosecutor informed the court that if Torrez testified, she would attack his credibility with evidence of his prior misdemeanor conviction for grand theft (§ 487), a crime of moral turpitude. Second, after defense counsel indicated he would present character witnesses to testify about Torrez's trait for non-violence, the prosecutor stated she would offer evidence of Torrez's prior bad acts to rebut the character evidence. Specifically, a December 2019 police report indicated that Torrez was seen attempting to break into cars, was uncooperative with the police when they asked for his identification, lied

14

to the police by giving a false name, and was arrested for deterring an officer in the performance of his duties (section 148), resulting in a probation violation.  The court agreed that the prosecutor could ask Torrez's character witness about his knowledge of this prior bad act.

Thereafter, Torrez's father (Hernandez) testified that he knew Torrez to be an honest and nonviolent person and that Torrez had a reputation in the community for honesty and nonviolence.  On cross-examination, the prosecutor asked whether he was aware that Torrez had a conviction for theft in Alameda County in 2019; Hernandez responded that he believed Torrez's girlfriend was responsible for that incident.  The prosecutor then asked, "Are you aware that in December of 2019, right before this incident, [Torrez] was arrested for allegedly trying to break into cars in Alameda?"   Defense counsel objected based on "relevance, 352; lack of foundation; lack of personal knowledge."  The court overruled the objections.  Hernandez responded, "No, I wasn't aware of that."  The prosecutor did not inquire further.

After the prosecution's case, defense counsel read the description of the incident from the 2019 police report into the record outside the presence of the jury.  According to the police report, a citizen advised that he had observed Torrez, who resembled a suspect from a prior vehicle burglary, attempting to break into cars.  Officers located Torrez, noted he matched the suspect's description, and detained him for investigation.  Torrez refused to provide identification, repeatedly gave the officers a false name, and claimed he did not recall where he lived.  Police arrested Torrez for violation of section 148—willfully resisting, obstructing or delaying a peace officer.

2.  Relevant Law of Prosecutorial Misconduct

Under federal law, a prosecutor's conduct requires reversal if it " 'so infected the trial with unfairness as to make the resulting conviction a denial

15

of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)  Under
state law, "the use of deceptive or reprehensible methods to attempt to
persuade either the court or the jury" is misconduct that requires reversal
only when it is reasonably probable that the defendant would have received a
more favorable result if the misconduct had not occurred.  (*People v.
Cunningham* (2001) 25 Cal.4th 926, 1000; *People v. Pigage* (2003)
112 Cal.App.4th 1359, 1375.)

Torrez contends the misconduct consisted of the prosecutor asking
Hernandez if he had heard that Torrez was arrested for allegedly breaking
into cars—an uncharged offense.  Evidence of uncharged offenses may be
admissible on at least two grounds.  First, as a prior bad act, it can
sometimes be introduced to attack the credibility of a testifying defendant.
(See Evid. Code, § 1101, subd. (c); *People v. Millwee (*1998) 18 Cal.4th 96, 131
[admissible to show "the implausibility and untruthfulness of defendant's
testimony"].)  Second, it can be introduced to discredit the testimony of a
witness who testified to the defendant's reputation for good character,
provided the prosecutor asks the question in good faith.  "When a defense
witness, other than the defendant himself, has testified to the reputation of
the accused, the prosecution may inquire of the witness whether he has heard
of acts or conduct by the defendant inconsistent with the witness' testimony.
[Citations.]  In asking such questions, the prosecutor must act in good faith
and with the belief that the acts or conduct specified actually took place.
[Citations.]  The rationale allowing the prosecution to ask such questions (in
a 'have you heard' form) is that they test the witness' knowledge of the
defendant's reputation."  (*People v. Wagner* (1975) 13 Cal.3d 612, 619; see
*People v. Mooc* (2001) 26 Cal.4th 1216, 1233 [it would be prosecutorial
misconduct to ask a witness questions that suggest facts harmful to a

defendant without a good faith belief that the questions would be answered affirmatively or the facts could be proved].)

        3. <u>Forfeiture</u>

To preserve an issue for appeal, an objection must be made in the trial court sufficient to apprise the court of the specific reason the objecting party believes the evidence should be excluded. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205–1206 [defendant must make timely and specific objection].)

Here, defense counsel objected to the prosecutor's question on the grounds of "relevance, 352; lack of foundation; lack of personal knowledge," but he did not object on the specific ground that the prosecutor was engaging in misconduct. Accordingly, Torrez did not preserve the issue of prosecutorial misconduct for appellate review. (*People v. Bolden* (2002) 29 Cal.4th 515, 563–564 [issue of prosecutorial misconduct was waived where the defense objected on grounds of hearsay and assuming facts not in evidence, but "did not object that the prosecutor was engaging in misconduct by implying facts the prosecutor was unable to prove"].)

Torrez argues that his "lack of foundation" objection was sufficient because a prosecutor's cross-examination of a character witness about conduct indicating the defendant's bad character is improper where there is no "foundation" for the belief the defendant committed the act in issue. But objecting on the ground of "lack of foundation" for admission of the testimony is not the same as objecting that the prosecutor lacked a good faith belief for asking the question. The "foundation" objection is itself ambiguous, since it can refer to a lack of personal knowledge or authentication, or perhaps some other evidentiary element such as a hearsay exception or compliance with the best evidence rule. But even if "lack of foundation" were sufficient to apprise the court of a concern over any and all foundational elements for the

17

*admission of the testimony* that the prosecutor was intending to elicit, it did not sufficiently bring the court's attention to whether the prosecutor had a good faith basis for *asking the question* in the first place.

Accordingly, the issue is waived. We nonetheless turn to the merits of the issue to avoid any potential issue of ineffective assistance of counsel.

4. <u>Merits</u>

As mentioned, the prosecutor asked Hernandez if he was aware Torrez was arrested for "allegedly trying to break into cars," while he was actually arrested for deterring an officer in violation of section 148 after being detained for allegedly trying to break into cars. The record suggests the prosecutor did not ask the question in bad faith, but simply misspoke. After all, the true ground for the arrest—deterring an officer—would have been more indicative of violence than an attempt to break into a car, so it is unlikely the prosecutor was motivated by bad faith when characterizing the arrest as *less* serious than it really was. Nor would it make sense for the prosecutor to ask about an arrest that never occurred and that Hernandez could therefore readily and truthfully deny, rather than asking about an arrest that Hernandez would potentially have to admit. It can safely be said, therefore, that the prosecutor did not act in bad faith; it is a closer question whether the prosecutor had an objectively good faith basis for asking about an arrest that was not indicated by the police report.

Even assuming the prosecutor's question constituted misconduct, however, it was harmless. For several reasons, there is no reasonable probability that Torrez would have obtained a more favorable verdict if the prosecutor had not asked the question (or if the court had sustained defense counsel's objections). (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also

18

*People v. Welch* (1999) 20 Cal.4th 701, 749–751 [evaluating erroneous admission of evidence under *Watson* standard].)

First, it is unlikely Hernandez's testimony as to Torrez's reputation for honesty and nonviolence carried much weight anyway, since Hernandez was Torrez's father. To the extent the jury would have accepted a relative's testimony, Torrez's brother also testified, and he was *not* asked about the purported arrest for attempted vehicle theft.

Second, the prosecutor asked Hernandez only one question about hearing of an arrest for allegedly breaking into cars, and Hernandez denied it. There was no other inquiry into the matter by the prosecution, and the prosecutor did not mention the matter in closing argument, even after Torrez's attorney asserted in the defense closing that the testimony of Torrez's father and brother "regarding his reputation for nonviolence is uncontested."

Third, while Torrez argues that the prosecutor's question tarnished his credibility by insinuating that he had been arrested for allegedly attempting to break into cars, it is difficult to see how the mere posing of this question to Hernandez would have affected Torrez's credibility any more than Torrez's own testimony that he "wasn't aware" he was on probation for a theft conviction. Indeed, it was this denial that the prosecutor used to attack Torrez's credibility in closing, noting particularly that Torrez's plea form had been introduced into evidence, the form showed he was convicted less than a year earlier, and Torrez had told his father about the conviction.

Fourth, if the prosecutor had asked about Torrez's *actual* arrest—for deterring a police officer—it would have been *worse* for Torrez and Hernandez. While Hernandez testified that Torrez was nonviolent and had a reputation for nonviolence, a question asking about an arrest for "willfully

19

resist[ing], delay[ing], or obstruct[ing a] police officer" is more suggestive of violence than is a question asking about allegedly attempting to break into cars. Similarly, to the extent Torrez's credibility was affected by a question about "allegedly trying to break into cars," it would have been no less affected by a question asking about an arrest for resisting an officer *after* being detained for allegedly trying to break into cars. And if the prosecutor had asked Hernandez about Torrez's actual arrest, the more likely Hernandez would have had to admit he knew about it. In short, by asking Hernandez the wrong question, the prosecutor did Hernandez (and Torrez) a favor.

Fifth, the court instructed the jury that the prosecutor's question was *not* evidence that Torrez had engaged in the conduct of attempting to break into cars. For example, the jury was instructed with CALCRIM No. 351, which reads: "The attorney for the People was allowed to ask defendant's character witnesses if they had heard that the defendant had engaged in certain conduct. These "have you heard" questions and their answers are *not evidence that the defendant engaged in such conduct.* [¶] You may consider those questions and answers only to evaluate the meaning and importance of the character witness's testimony." (Italics added.) The jury was further instructed: "Nothing that the attorneys say is evidence. . . . [T]heir remarks are not evidence. Their questions are not evidence. . . . The attorneys' questions are significant only if they helped you to understand the witness's answers. [¶] Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." We assume the jury followed these instructions. (*People v. Mooc, supra,* 26 Cal.4th at p. 1234.)[5]

---

[5] Torrez argues that the jury instructions did not cure the misconduct, citing *People v. Wagner, supra,* 13 Cal.3d 612 and *Awkard v. U.S.* (D.C. Cir. 1965) 352 F.2d 641. In *Wagner*, a pre-Proposition 8 case, the prosecutor asked questions of the defendant that exceeded the scope of permissible

20

Torrez argues that deterring a police officer by failing to provide identifying information is not a crime of moral turpitude, so it was not a proper matter for the jury's consideration. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295–296 [past criminal conduct amounting to a misdemeanor may be admissible if it logically bears on the veracity of witness, i.e., moral turpitude].) Not so. The question was not asked by the prosecutor to attack Torrez's credibility, but to impeach Hernandez's credibility and his testimony that Torrez was not violent and had a reputation for nonviolence.

5. No Constitutional Violation by Questioning

Torrez argues that the trial court, in allowing the prosecutor to question Hernandez about his 2019 arrest absent a good faith belief that such misconduct occurred, abused its discretion in admitting the evidence and violated his state and federal constitutional right to due process and a fair trial. Based on our foregoing discussion, the court did not commit prejudicial error in allowing the prosecutor to ask a question about Torrez's 2019 arrest; nor did it violate Torrez's state or federal rights to due process and a fair trial.

Torrez declares that, based on the prosecutor asking Hernandez whether he was aware of the purported arrest for breaking into cars, which the prosecutor "knew" to have been made without probable cause, and the

---

cross-examination of a criminal defendant, repeatedly insinuating that the defendant had sold cocaine and heroin in the past, without evidence that he had ever been convicted. (*Wagner, supra*, at pp. 615–619.) Here, the prosecutor asked a single question of a reputation witness, not the defendant. In *Awkard*—a decision not binding on this court—the prosecutor repeatedly asked clearly improper and highly prejudicial questions of a character witness who had testified that she did *not* know the defendant's reputation in the community or about the period in question. (*Awkard, supra*, at pp. 645–646.) Not so here.

21

police having arrested Torrez "without probable cause in the first place," "[t]he notion that Mr. Torrez's Hispanic race and/or ethnicity did not play a role in causing this extraordinary concomitance of adverse irregularities strains credulity," thus constituting federal constitutional error.

There is, however, no evidence whatsoever that race played any factor at all in the prosecutor's question or Torrez's arrest, and there was no such aspersion in the trial court. Appellate counsel therefore seems to contend the acts of the San Francisco prosecutor and police officers must have been racially motivated merely because the defendant's last name is Torrez. On this record, the argument is untenable.[6]

C. Cumulative Prejudice

Torrez claims that his conviction should be reversed because of cumulative prejudice resulting from the errors raised on appeal. Because he fails to establish multiple errors, the argument is unavailing. (See *People v. Capers* (2019) 7 Cal.5th 989, 1017.) In any event, Torrez has not established that he failed to receive due process and a fair trial. (See *People v. Alcala* (1992) 4 Cal.4th 742, 810.)

D. Fees in Minute Order

On the record at the sentencing hearing, the court imposed a $40 court operations fee, a $30 critical needs assessment, and a $150 restitution fine. Because Torrez had already been in custody 99 days longer than his 180-day

---

[6]     Torrez cites *Rochin v. California* (1952) 342 U.S. 165, which involved conduct that "shock[ed] the conscience," consisting of three police officers illegally breaking into the defendant's home, forcibly opening his mouth and attempting to remove what was there, handcuffing him and taking him to a hospital, directing a doctor to force an emetic solution through a tube into his stomach against his will, and inducing him to vomit his stomach's contents so the officers could obtain evidence that was later used to convict him. (*Id.* at pp. 166, 169.) Nothing remotely akin to that occurred here.

jail sentence, the court stated it was "going to deem it's been taken care [of]," referring apparently to the fees.

The sentencing minute order of November 12, 2020, reflects the imposition of the $40 court operations fee, the $30 critical needs assessment, and the $150 restitution fine. Torrez contends the minute order should be corrected to reflect that he is no longer subject to those fines and assessments. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate court may correct clerical errors].) Respondent agrees, and we will so order.

The sentencing minutes also reflect the imposition of a $25 own-recognizance administrative screening fee pursuant to section 1463.07 (OR fee), which the court had not stated on the record. Torrez argues that, because the OR fee was not orally imposed at sentencing, the fee should be stricken from the minute order. When there is a discrepancy between the court's oral pronouncement and a minute order, the former generally controls. (E.g., *People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073.)

Respondent argues, however, that the OR fee was a mandatory fee under former section 1463.07 at the time it was imposed (November 2020), and if a trial court omits a mandatory assessment or fee, an appellate court may correct the omission and impose the fee on appeal. (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157.) Therefore, respondent urges, the $25 fee should stand. (*People v. Benner* (2010) 185 Cal.App.4th 791, 797 [imposing § 1463.07 fee].)

Torrez counters that section 1463.07 has since been repealed (Stats. 2021, ch. 257, § 34) and the OR fee is now unenforceable pursuant to section 1465.9, subdivision (a). Although section 1465.9 did not become effective until September 2021, after Torrez was sentenced, Torrez claims the statute operates retroactively because it states that "[t]he balance of any

23

court-imposed costs pursuant to Section . . . 1463.07 . . . shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (§ 1465.9, subd. (a).) To avoid Torrez having to initiate a separate proceeding in the trial court after remand to have the OR fee vacated pursuant to section 1465.9, Torrez urges that we strike the fee now.

Although matters of fees and credits must ordinarily be raised first in the trial court, in the interest of judicial economy we will address the parties' skirmish over $25 here. Because (1) the record unequivocally reflects the trial court's intention to deem $220 in fees to be deemed paid in light of Torrez spending 99 days beyond his sentence in jail, (2) the court never imposed the OR fee on the record, and (3) section 1465.9 provides in effect that the OR fee is unenforceable and uncollectible and should be vacated, we order the OR fee stricken from the sentencing minutes.

### III. DISPOSITION

In the sentencing minute order of November 12, 2020, the $40 court operations fee, the $30 critical needs assessment, the $150 restitution fine, and the $25 own-recognizance administrative screening fee are stricken. The judgment is affirmed in all other respects.

24

_____

NEEDHAM, J.

We concur.

_____

JACKSON, P.J.

_____

SIMONS, J.

*People v. Torrez* / A161474

25